1            **UNITED STATES DISTRICT COURT**

2               **DISTRICT OF NEVADA**

3    **THE HONORABLE JAMES C. MAHAN, JUDGE PRESIDING**

4

5

6   RIGHTHAVEN, LLC,

7          Plaintiff,

8   vs.                        **NO. 2:10-CV-1322-JCM-LRL**

9   CENTER FOR INTERCULTURAL
    ORGANIZING, et al.,        **SHOW CAUSE HEARING**
10

11         Defendant.
                           /
12   ─────────────────────────

13

14       **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15          TUESDAY, DECEMBER 28, 2010

16                10:30 A.M.

17

18   **APPEARANCES:**

19   For the Plaintiff:     SHAWN A. MANGANO, ESQ.
                            JOHN CHARLES, COONS, ESQ.
20
     For the Defendants:    JASON M. SCHULTZ,
21                          CHRIS J. RICHARDSON, ESQ.
                            MATTHEW CAVANAUGH, ESQ.
22                          CHAD BOWERS, ESQ.

23

24

25   Reported by:  Joy Garner, CCR 275
                   Official Federal Court Reporter

1      LAS VEGAS, NEVADA, TUESDAY, DECEMBER 28, 2010

2                          10:30 A.M.

3                         *    *    *

4                  P R O C E E D I N G S

5

6           THE CLERK:  This is the time set for

7    the show cause hearing, Civil Case Number

8    2:10-CV-1322-JCM-LRL, Righthaven, LLC versus

9    Center for Intercultural Organizing, and all

10   others.

11                  Counsel, please note your

12   appearance for the record.

13         MR. MANGANO:  Your Honor, Shawn Mangano

14   on behalf of the plaintiffs.  With me is Charles

15   Coons.

16         THE COURT:  Yes, sir.

17         MR. MANGANO:  Thank you.

18         THE COURT:  Yes, sir.

19         MR. RICHARDSON:  Good morning, your

20   Honor, Chris Richardson from the law firm of

21   Olson, Cannon, Gormley and Desruisseaux and with

22   me and is Matt Cavanaugh on behalf of the

23   defendants.

24         THE COURT:  All right.  Mr. Bowers.

25         MR. BOWERS:  Good morning, your Honor,

1    Chad Bowers on behalf of Professor Jason Schultz.

2            THE COURT:  All right.

3            MR. BOWERS:  While we are here, it's a

4    little unusual with Mr. Schultz being amicus --

5            COURT REPORTER:  Please speak into a

6    microphone, Mr. Bowers.

7            THE COURT:  Come up to the lectern

8    here, Mr. Bowers, it's easier.

9            MR. BOWERS:  Thank you, your Honor.

10           THE COURT:  Yes, sir.

11           MR. BOWERS:  Can you hear me?

12           THE COURT:  We're good.

13           MR. BOWERS:  Okay.  Anyway Mr. Schultz

14   being amicus, it's a little unusual.  I have

15   nothing to contribute in the courtroom, you'll

16   hear from him.  I have another commitment so I

17   was going to ask the Court's permission that if

18   this runs long, I might be able to leave and let

19   him speak for himself.

20           THE COURT:  Oh, yes, sir, sure.  We

21   don't want to hear from you anyway.

22           MR. BOWERS:  And certainly not on this

23   topic you don't I guarantee you.  Thank you, your

24   Honor.

25           THE COURT:  All right, and there are a

```
 1    couple of preliminary matters and you're welcome,
 2    Professor, to sit in.  I took Latin from Mrs.
 3    Corover (phonetic) so we pronounce it ameecus
 4    (phonetic), but you can call him amacus
 5    (phonetic) if you want to, but there are a couple
 6    of preliminary matters.
 7                    First of all, as far as the
 8    professor is concerned coming in as an amicus if
 9    this were a gun control case, we'd have the NRA
10    and the Brady Organization people here wanting to
11    file amicus briefs.  So, you know, I mean it's
12    understandable, I understand that the plaintiff
13    says he's a partisan, but people who file amicus
14    briefs are always partisan.
15                    And, of course, you can say,
16    well, wait, here's an exception and you can
17    always find an exception to a general statement,
18    but generally the people who are interested
19    already have a partisan, they already have a dog
20    in the hunt, if you will, and so I take that into
21    account, but I'm glad to hear from people.  If
22    you have something to contribute, fine.  If not,
23    I'll cut you off.
24                    And that's true of the lawyers,
25    and I'm sure you're used to cutting students off
```

1   when they go on too long.  So I'll exercise the

2   same privilege.  So I'm inclined to let the

3   professor come in and present whatever you want

4   to present and we'll listen to it.

5                    Just as a preliminary matter,

6   I'm inclined to find that I have jurisdiction,

7   not general jurisdiction, but I think specific

8   jurisdiction.  The defendants purposefully

9   availed themselves by taking an article from a

10  Nevada newspaper knowing that the copyright

11  belonged to the newspaper and intentionally

12  posting it on their website.  And the plaintiffs'

13  claim then arise out of the defendants'

14  formulated activities because the RJ is a Nevada

15  paper.  It's the largest paper in Nevada and

16  obviously the posting of that is related to the

17  newspaper's home which is Nevada.

18                   So I -- and I'll give you a

19  chance to say anything you want to say on that

20  issue, but let's not spend a lot of time on

21  jurisdiction unless you have some killer point

22  that you want to make, but I want to focus on the

23  fair use.  As I was going through this file with

24  my brain trust here seated to my right in the

25  jury box, this fair use popped out at us and it

```
1   just seemed like an overriding issue, and that's
2   the genesis for this hearing.
3               It seems like that was just an
4   issue that really popped out that needs to be
5   addressed early on.  These cases I think, you
6   know, typically probably get settled.  You can
7   tell me -- the plaintiffs can tell me that more
8   easily than anyone else, and you don't have to,
9   but I assume they get settled and the fair use
10  doctrine never gets raised probably, and it's
11  something that I think needs to be addressed.
12              So that's why we're here.  Now
13  I'll hear from the plaintiffs first.  I'll be
14  glad to hear whatever you have to say.  And, if
15  you would, come up to the lectern, please.  And
16  you're Mr. Coons, correct?
17          MR. MANGANO:  Mangano.
18          THE COURT:  I'm sorry, you're --
19          MR. MANGANO:  Mr. Mangano.
20          THE COURT:  Mangano, is that the way
21  you pronounce it?
22          MR. MANGANO:  That is correct.
23          THE COURT:  I mean I have Italian
24  heritage, and I pronounce it Manyano (phonetic)
25  is what I would call you.
```

1          MR. MANGANO:  No one could spell it if

2  I pronounced it that way.  So I've always gone

3  with Mangano.

4          THE COURT:  If you would, put your

5  right hand on the slant there, your right hand.

6          MR. MANGANO:  Okay.

7          THE COURT:  Do you feel the button?

8          MR. MANGANO:  Yep.

9          THE COURT:  Push the button.

10          MR. MANGANO:  All right.

11          THE COURT:  Okay, that's good.  It

12  still doesn't work, does it?  That's supposedly

13  how you adjust the microphone.  I was going to

14  show you your tax dollars at work.

15          MR. MANGANO:  It doesn't work.

16          THE COURT:  But instead you'll just

17  have to adjust the microphone manually like that,

18  if you would, please, sir.

19               All right, go ahead.

20          MR. MANGANO:  All right, your Honor, as

21  you mentioned, we're here to discuss this issue

22  of fair use.  Fair use is an affirmative defense.

23          THE COURT:  Right.

24          MR. MANGANO:  It is an affirmative

25  defense that obviously the defendants bear the

```
 1    burden of proof and the burden of persuasion.
 2    One issue that we were unable to glean from the
 3    OSC was the procedural posture of this when the
 4    Court says that it's considering dismissal based
 5    upon fair use.
 6                   There's two basis that we could
 7    see as you have an authority to do so sua sponte
 8    under the Federal Rules of Civil Procedure, one
 9    being 12(b)(6) and one being Rule 56.  If
10    possible, I'd like to get some direction as to
11    what your thoughts are and where the Court is
12    leaning with regard to those two.
13             THE COURT:  I don't answer questions.
14             MR. MANGANO:  Because the problem I
15    have, your Honor, is that under 12(b)(6), as
16    you're aware, we're confined to the allegations
17    in the complaint.  When we have a fair use
18    defense, that's going to be something that's
19    outside of the complaint and normally I would
20    assume it would be something that would be raised
21    more in the judgment on the pleadings.  In this
22    case we don't have a procedural posture that
23    would allow for judgment on the pleadings because
24    there is no answer in place, therefore, the
25    pleadings are not locked in.
```

1          THE COURT:  So you want -- what are you

2  suggesting?  That we adjourn this and tell them

3  to file an answer and then we'll reconvene next

4  week or something?

5          MR. MANGANO:  Well, the problem is,

6  your Honor, is that 12(b)(6) I don't believe is

7  the proper mechanism if you were to move forward

8  with dismissal.  The other alternative would be

9  Rule 56.  Obviously Rule 56, there's different

10  standards which apply under each.  Rule 56

11  obviously we're looking at whether or not there's

12  issues of -- genuine issues of material fact

13  which preclude entry of judgment in favor of the

14  defendant.

15          THE COURT:  I think I've heard about

16  that rule before.

17          MR. MANGANO:  Yeah, and that's

18  particular --

19          THE COURT:  I know I look stupid, but I

20  didn't just fall off the turnip truck, okay?

21          MR. MANGANO:  No, your Honor, I -- I --

22          THE COURT:  So what's your point?

23  What's your point?

24          MR. MANGANO:  My point is is that we

25  have a case here where we're not -- there's

1  issues of fact that have been raised -- first of

2  all, numerous issues of fact raised by the

3  professor's amicus brief.  It's replete with

4  factual assertions that are unsupported.  They

5  are not there in a signed declaration and we have

6  not had an opportunity to conduct discovery on

7  those.

8          THE COURT:  So what?  So you want to

9  conduct discovery, is that what you want to do?

10          MR. MANGANO:  If -- yes, your Honor,

11  sure, if that's --

12          THE COURT:  On what issues?  What

13  issues do you want to conduct discovery on?

14          MR. MANGANO:  Well, if we have an issue

15  as to the effect on the market for work, the

16  issues related to website traffic, issues related

17  to revenues derived from the posting of the work,

18  these are all issues that are raised by Professor

19  Schultz in his filing with the court which would

20  require discovery for there to be a ruling under

21  Rule 56 at this stage.  I mean we're simply

22  getting the cart in front of the horse on that

23  issue.

24          THE COURT:  Do you really think that

25  the defendants make a lot of money from their

1   website, is that what you're saying?

2          MR. MANGANO:  No, I'm not saying --

3          THE COURT:  That they're competing with

4   the RJ maybe?

5          MR. MANGANO:  No.

6          THE COURT:  They're making a ton of

7   dough from this you think?

8          MR. MANGANO:  No, your Honor, I don't

9   believe that's the proper inquiry whether or not

10  they've made a ton of dough or if they've made a

11  little dough.  If you like, we can start walking

12  through the fair use analysis and the first prong

13  would --

14         THE COURT:  Well, you are the one that

15  said you had some question that you didn't know

16  what we were doing, you're not sure how to

17  proceed.  So what do you want me to do?

18         MR. MANGANO:  What would I like you to

19  do?  Well --

20         THE COURT:  I mean rule in your favor

21  obviously, but what are you saying?  I mean get

22  to the point.  I can tell you're a lawyer --

23         MR. MANGANO:  Yes.

24         THE COURT:  -- because I don't know

25  your point, what's your point?  You want me to

1  adjourn this hearing so you can conduct

2  discovery?  What?  What do you want?  What are

3  you seeking?

4          MR. MANGANO:  Well, your Honor, if

5  you're inclined to dismiss our complaint at this

6  stage of the proceedings on fair use grounds,

7  yes, we'd like -- we --

8          THE COURT:  Well, that's what an order

9  to show cause -- that's why you're here is to

10  show cause why it shouldn't be dismissed.

11          MR. MANGANO:  That's correct.

12          THE COURT:  Why shouldn't it be

13  dismissed?

14          MR. MANGANO:  Well, for one, your

15  Honor, procedurally, and I'll just say that we do

16  not have a record in front of you that would

17  permit you to enter sua sponte summary judgment

18  because there are numerous issues of fact --

19          THE COURT:  But that -- you're

20  repeating yourself.  What issues are they?  Here

21  are the issues.  Number one, is the CIO a

22  nonprofit organization or whatever?  I don't

23  know.  What are these issues of fact that are so

24  important?

25          MR. MANGANO:  Okay.  Well, your Honor,

```
1    one of the issues of fact talks about the effect
2    on the work, the market for the work, the fourth
3    factor.  If you look at Professor Schultz's
4    amicus brief, it contains statements which are
5    relevant to the inquiry.
6              THE COURT:  But every brief does that.
7    Everybody -- all briefs contain factual
8    allegations.  I mean what are the genuine issues
9    of material fact?  What's the material fact here?
10             MR. MANGANO:  Well, one of the issues
11   of material fact, your Honor, would be how --
12   how -- what was the intent of CIO in its use?
13   Did it derive a benefit from the use of the
14   article?  What was that benefit?
15             THE COURT:  What's the material issue
16   of fact?
17             MR. MANGANO:  That -- your Honor, that
18   just was the material issue of fact.
19             THE COURT:  What?  What their intent
20   is?
21             MR. MANGANO:  What was the intent?
22   What was the amount?  Was there revenue derived
23   from it?
24             THE COURT:  Okay, that's three
25   questions.  Now, what's the issue of material
```

1  fact?  I said what's the issue of material fact?

2  And you should say this, this, and this.  What is

3  the issue of material fact?

4          MR. MANGANO:  Whether or not they

5  derived a benefit from it would go into your

6  analysis.

7          THE COURT:  Well, of course they

8  derived a benefit from it.

9          MR. MANGANO:  Okay, your Honor --

10          THE COURT:  I'm willing to draw that

11  conclusion they derived a benefit from it.

12          MR. MANGANO:  That's fine, that's fine.

13  If we're going to accept they derived a benefit

14  from it, then I would submit that under the first

15  factor that that's going to weigh against upon

16  the fair use.

17          THE COURT:  Okay, and that may be.  Now

18  let's stick to the issue, though, which we've

19  spent now ten minutes on.  What do you want

20  today?  Do you want to conduct discovery, is that

21  what you're saying?  What discovery do you want

22  to conduct?

23          MR. MANGANO:  Your Honor --

24          THE COURT:  I mean if you're telling me

25  this is not appropriate for dismissal, you're

1  making something in the nature of a 56(f)

2  argument.  So you say here are the genuine issues

3  of material fact, one --

4             MR. MANGANO:  And, your Honor, we --

5             THE COURT:  -- is this a Nevada

6  corporation?  Two, is Mr. Bowers a licensed

7  attorney in the State of Nevada?  Three, is this.

8  Four, five, six, seven, eight, nine, ten, those

9  are the genuine issues of material fact that

10  preclude you from proceeding until I can do

11  discovery.  And then I'll give you a chance to do

12  discovery, but so far you're waltzing around and

13  saying, oh, we're going to do this and, you know,

14  what their intent was and, you know, the market

15  effect, and ya, da, da, da, da.

16             What are the genuine issues of

17  material fact?

18             MR. MANGANO:  Your Honor, we did, in

19  fact, ask for 56(f) discovery and there was a

20  declaration submitted.  There has been no

21  discovery conducted in the case as of today.

22             THE COURT:  I realize that.  Answer my

23  question, would you?

24             MR. MANGANO:  Yes, your Honor.

25             THE COURT:  Gee whiz.

1          MR. MANGANO:  What are the issues of

2  material fact is the question.

3          THE COURT:  Pardon me?

4          MR. MANGANO:  What are the issues of

5  material fact is the question.  Well, one of them

6  is how much and what, if any, benefit was derived

7  through the donations.  That's one issue.  We

8  don't have any --

9          THE COURT:  That were derived from the

10  what?

11          MR. MANGANO:  That were derived from

12  the posting on CIO's website.  If we're going to

13  assume --

14          THE COURT:  What was the benefit?  How

15  is that relevant?

16          MR. MANGANO:  Well, that goes into the

17  first factor of the fair use analysis, your

18  Honor, and how they used the work.

19          THE COURT:  The purpose and character

20  of the use --

21          MR. MANGANO:  Yes.

22          THE COURT:  -- the purpose and use of a

23  character is what you see is what you get.

24          MR. MANGANO:  Well, no, your Honor,

25  because under that analysis there's a division

```
 1   which talks about whether it's for commercial use
 2   or whether or not it's for educational purposes.
 3             THE COURT:  For a nonprofit
 4   organization, how is that commercial use?
 5             MR. MANGANO:  Okay, your Honor, as we
 6   discussed in our submission, the World Wide
 7   Church of God case in the Ninth Circuit says that
 8   that purpose and character analysis, that first
 9   prong, commercial use or use for profit can be
10   derived from benefits received by a nonprofit
11   organization.  You can have that result, your
12   Honor, and World Wide Church of God talks about
13   that because it squarely addressed whether or not
14   nonprofit --
15             THE COURT:  But that's not on point,
16   though, is it?  That's a case where the minister
17   wrote a book and then some rivals took the book,
18   removed the copyright, and then tried to pass it
19   off and say, well, I'm in competition with the
20   original church, right?
21             MR. MANGANO:  That's correct.
22             THE COURT:  And so CIO, the defendants
23   here, have a rival newspaper and they took this
24   RJ article -- and let me see if I can follow
25   through now -- they took the RJ article, erased
```

1  the copyright and then used it as their own --

2  no, that's not it.  World Wide Church doesn't

3  apply here.  That was a deliberate misuse of the

4  copyrighted material.

5           Here you've got these dodo's

6  took the material and actually put on their

7  website Las Vegas Review Journal, you know, Joe

8  Blow, whoever the reporter was.  I mean it's

9  clear.  Where did you get the article?  It's

10  quite clear, the Las Vegas Review Journal.

11       MR. MANGANO:  Okay, but if I could

12  maybe point out with the World Wide Church of God

13  case, it is applicable to this case because it

14  shows that a nonprofit organization can be found

15  liable for copyright infringement in view of the

16  fair use defense.  That's one point that it

17  makes.  Another point that it makes is it deals

18  with a case of a hundred percent replication of

19  the work which is what we have here.

20       THE COURT:  It was a book there.  Here

21  it's an article that's what, like eight column

22  inches long?

23       MR. MANGANO:  This is an article that's

24  approximately a thousand words, thirty

25  paragraphs.

```
 1              THE COURT:  A thousand what?

 2              MR. MANGANO:  A thousand words.

 3              THE COURT:  A thousand words?  A

 4  thousand words?

 5              MR. MANGANO:  And it's thirty

 6  paragraphs.

 7              THE COURT:  It's about eight column

 8  inches or so on their website or it looked like,

 9  if I remember correctly.

10              MR. MANGANO:  I had a hard copy printed

11  out, your Honor, and it was three pages.

12              THE COURT:  Okay, all right.

13              MR. MANGANO:  But in any event they're

14  both written works and they are both entitled to

15  copyright protection.  So the World Wide Church

16  of God is applicable here because we have --

17              THE COURT:  The World Wide Church is

18  distinguishable.

19              MR. MANGANO:  Okay.

20              THE COURT:  That's a book.  That was a

21  creative book.  This is a news article.

22              MR. MANGANO:  Okay, your Honor, the

23  work -- both are written works.  Both -- and

24  we've cited case law to your Honor that shows

25  that just because we have a news article it's --
```

1          THE COURT:  That's true, that's true,
2    but let's -- the devil can cite scripture for his
3    purposes.  I can find a case that will say
4    anything.  So cases are interesting, that's all,
5    but now what are the genuine issues of material
6    fact?  Maybe we'll get to this ultimately or
7    maybe you just want to blather on.  You tell me.
8          MR. MANGANO:  Well, your Honor, maybe I
9    could just --
10         THE COURT:  What are the genuine issues
11   of material fact?  You're saying you can't
12   proceed today, we have genuine issues of material
13   fact.  What are they?  What are the issues you
14   want to do discovery on?
15         MR. MANGANO:  Your Honor, we have set
16   forth in our submission --
17         THE COURT:  Which submission?
18         MR. MANGANO:  My declaration, then the
19   brief.
20         THE COURT:  Which submission?  The one
21   you filed this morning?
22         MR. MANGANO:  No, your Honor.  If you
23   could -- can you give me a second and I'll see if
24   I can find the document number for that.  I mean
25   I know it was filed in connection with our

1   response.

2            THE COURT:  Okay, but it's your

3   declaration and you can't tell me what the

4   genuine issues of material fact are that you set

5   out in your declaration?  See if you can find a

6   copy of it then.

7            (Attorney conference held.)

8            MR. MANGANO:  Your Honor, while Mr.

9   Coons is locating that, I'm willing to move

10  forward on the fair use analysis.

11           THE COURT:  Well, no, if we can't have

12  a hearing, we can't have a hearing.  If there are

13  genuine issues of material fact, we can't have a

14  hearing.  You need to do discovery.  That's what

15  you're telling me, correct?

16           MR. MANGANO:  Yes, and we've

17  done absolutely none.

18           THE COURT:  All right, then let me know

19  what the genuine issues of material fact are.

20           (Attorney conference held.)

21           MR. MANGANO:  Your Honor, unfortunately

22  I don't have a copy of my declaration.  I know

23  it's Document 23 in the court's record.  I've got

24  Document 22 which references it.

25           THE COURT:  All right, so what are

1   the -- fifteen minutes later -- what are the

2   genuine issues of material fact?

3           MR. MANGANO:  Well, your Honor, I would

4   submit that at a minimum the issues of fact

5   relate to the Court's analysis under the

6   fourth --

7           THE COURT:  Well, not relate, don't

8   give lawyer gibberish.  What are the -- here are

9   the issues of fact.  One, whether this is that,

10  whether CIO is a licensed organization, or

11  something, or whatever.  I don't know, whatever

12  in heck the issues of fact are that preclude us

13  proceeding today.

14          MR. MANGANO:  The fourth factor in the

15  fair use analysis --

16          THE COURT:  Pardon me?

17          MR. MANGANO:  The fourth factor under

18  the fair use analysis relates to the market, the

19  effect on the market for the work.  That's one of

20  the --

21          THE COURT:  The effect of the use upon

22  the potential market, now since Righthaven

23  doesn't operate a newspaper, all it does is sue

24  people apparently, I don't know, what is the

25  issue of fact there?

1          MR. MANGANO:  Well, one of the facts

2     that's pointed out by Professor Schultz is an

3     issue of causation with regard to whether or not,

4     as you pointed out, whether or not there is any

5     effect on the work -- on the market for the work

6     based upon their use.  Right now one of our first

7     arguments under that prong is a presumption,

8     okay?

9               And if that presumption does not

10    apply because there is an absence of commercial

11    use, then we must show actual affect on the

12    market for the work.  We must have evidence of

13    that fact.  They're claiming that they have no

14    affect on the market because there was no website

15    traffic, there weren't enough lures.

16               We don't have any of that

17    information, your Honor.  That would be an issue

18    of fact as to whether or not there were a hundred

19    viewers or a thousand viewers or how many viewers

20    there were.  We don't know.  That's one issue of

21    fact.

22          THE COURT:  How is that relevant,

23    though?

24          MR. MANGANO:  Well, your Honor, it's

25    under the fourth factor of the fair use analysis.

1            THE COURT:  Well, the affect of the use

2    upon the potential market for or value of the

3    copyrighted work, there's no market for the

4    copyrighted work, is there?  You aren't

5    publishing it, you don't have a newspaper.

6            MR. MANGANO:  Your Honor, there's other

7    moving parts here.  If we've got a license -- if

8    we have an assignment of the mark, we can also

9    license that work to others.  I mean that --

10   that --

11           THE COURT:  Have you licensed it to

12   others?

13           MR. MANGANO:  Your Honor, that would be

14   subject to discovery.  Do you want me to answer

15   that on behalf of my client?  I don't know as I

16   stand here right now.

17           THE COURT:  So you are telling me you

18   don't know.  This is an issue of fact, but you

19   don't know your own side of this issue of fact.

20   You don't know, you can't argue anything about it

21   then.

22           MR. MANGANO:  Well, your Honor --

23           THE COURT:  You don't know if you've

24   licensed it.

25           MR. MANGANO:  That's fine, that's fine,

1   your Honor.  We can proceed then I guess.  If the

2   Court doesn't appreciate the issues of fact,

3   we've submitted them in our brief.

4            THE COURT:  Well, no, no, what I would

5   appreciate would be an answer to my question

6   which I asked over fifteen minutes ago and you

7   haven't answered yet.

8            MR. MANGANO:  Your Honor, I've tried.

9            THE COURT:  You haven't tried.

10  You've -- all you've given me is the lawyer mumbo

11  jumbo.  What are the issues of fact?  One, two,

12  three, four, five, that's what we need to do

13  discovery on.  With 56(f), this is why I need to

14  do discovery.  I can't respond to CIO here

15  because I need to do discovery on this issue,

16  one, two, three, four, five, and then we'll

17  adjourn and give you a chance to do your

18  discovery.

19            MR. MANGANO:  Okay, your Honor.

20            THE COURT:  And then we'll come back

21  here and deal with the fair use doctrine.

22            MR. MANGANO:  Okay, your Honor, but let

23  me approach it this way then.  Here's a listing

24  of statements that are made that Professor

25  Schultz has made in his brief that raise issues

```
 1    of fact that would require discovery and we'll go

 2    down the list.

 3              THE COURT:  Well, no, don't, don't.  I

 4    don't want to hear what he says.  I want to hear

 5    what you are telling me the issues of fact are.

 6              MR. MANGANO:  Okay.

 7              THE COURT:  What do you need to do

 8    discovery on?

 9              MR. MANGANO:  Who are the readers of

10    CIO's blog?  They claim that the readers are

11    specifically --

12              THE COURT:  Now, why is that a material

13    issue of fact?

14              MR. MANGANO:  Yes, who are the readers?

15              THE COURT:  Why?  Why?  Why?  Why is

16    that an issue of material fact?

17              MR. MANGANO:  It is an issue of

18    material fact, your Honor, because the use of the

19    work they're claiming, as has been argued in the

20    briefs, that their blog is specifically directed

21    towards Oregon residents and immigrants in the

22    Oregon area, okay?  We have a Nevada based

23    article from a Nevada publication, and they're

24    claiming that their use is different from our

25    use.  Both uses are giving information to the
```

1    public about a topic related to immigration.

2                    THE COURT:  That's right.

3                    MR. MANGANO:  They are saying that

4    their use is unique because it's directed to a

5    specific segment of the population, residents of

6    Oregon, okay?  One of the statements contained in

7    the amicus brief says that readers of CIO's blog

8    are most likely Oregon residents each vested in

9    the nonprofit's mission.

10                   THE COURT:  Most likely, and it could

11   be anybody because it's the Internet.  I could

12   log on.

13                   MR. MANGANO:  Well, your Honor, you

14   would have to grant that if they were readers of

15   the blog or members of the organization that were

16   Nevada residents, then you would also be

17   disseminating information concerning a Nevada

18   based article to people in Nevada as well as

19   Oregon.  That is --

20                   THE COURT:  Which the RJ has done, it's

21   an RJ article.

22                   MR. MANGANO:  Yes.

23                   THE COURT:  So I mean people in Nevada

24   already have access to it.

25                   MR. MANGANO:  Well, that's correct,

1   but, see, the use that's being employed here is

2   we're both disseminating the same article and

3   we're both doing it for informative purposes,

4   okay?

5         THE COURT:  You aren't disseminating

6   the article to anyone.  The RJ disseminated the

7   article.

8         MR. MANGANO:  That's correct.  The RJ

9   disseminated the article, but in doing so if

10   you're doing it for the same purpose which is

11   that first prong --

12         THE COURT:  The RJ is a newspaper,

13   correct?

14         MR. MANGANO:  Correct.

15         THE COURT:  The CIO a not a newspaper.

16         MR. MANGANO:  Correct.

17         THE COURT:  So what's the -- and

18   understand I'm not saying let's create some

19   issues of fact.  What's material about that?

20         MR. MANGANO:  Well, what's material

21   about the Oregon --

22         THE COURT:  They aren't competing with

23   the RJ.

24         MR. MANGANO:  No, no, no, it's not a

25   matter of competing directly.  They don't have to

```
 1   be newspaper to newspaper or in World Wide Church
 2   of God, which we've pointed out, church to
 3   church.  They are taking the same information and
 4   they are making it available at another location.
 5              'THE COURT:  That's right.
 6              MR. MANGANO:  So what that does is from
 7   our standpoint you go to read that article on
 8   their website and you don't read it on the RJ's
 9   website, the RJ's deprived of certain benefits
10   because of that.  I mean as we go on the Internet
11   we've got banners of advertisements and all that
12   stuff and other articles, too, that may be linked
13   or associated with that publication.
14              THE COURT:  But that's the RJ and now
15   it's been assigned to you, you have now have the
16   copyright.
17              MR. MANGANO:  That's correct.
18              THE COURT:  And you don't publish a
19   newspaper.
20              MR. MANGANO:  No.
21              THE COURT:  Okay.
22              MR. MANGANO:  But we are not looking at
23   Righthaven now, we're looking at when the
24   infringement occurred.  So it still -- we've --
25   we've raised the standing issue, but it's a
```

1  matter of let's look at when the infringement

2  occurred and what we're dealing with.  We're

3  dealing with use by the RJ, the source

4  publication where the work originated and how it

5  was used in CIO's case on their blog.

6          THE COURT:  I mean you've been going

7  twenty minutes and you've given absolutely no

8  information.  I mean what are the issues of

9  material fact?  You're saying that we cannot

10  proceed today, is that your position?  Is that

11  what you are telling me, we cannot proceed today?

12          MR. MANGANO:  That's if you're inclined

13  to dismiss it, yes.  We do not believe that

14  there's sufficient --

15          THE COURT:  I'm not going to tell you

16  what I'm inclined to do.  I mean I want to hear

17  what the parties have to say.  So I mean you're

18  saying, if you're going to rule against me, yeah,

19  I can't proceed today, but if you're going to

20  rule in my favor, yeah, I can proceed today.

21          MR. MANGANO:  Okay, your Honor, one of

22  the issues of material fact as I just pointed out

23  was who are the members of CIO, who are the

24  readers?

25          THE COURT:  And how is that material?

1          MR. MANGANO:  How is it?

2          THE COURT:  Yeah, how it that material?

3          MR. MANGANO:  It is material, your

4    Honor, because it goes directly towards the

5    nature and use under the first fair use prong.

6          THE COURT:  Okay, that does not answer

7    my question at all, does it?

8          MR. MANGANO:  The first fair use --

9          THE COURT:  That's lawyer speaking.

10   The first one is purpose and character of the

11   use.

12         MR. MANGANO:  Okay.

13         THE COURT:  We know how they used it,

14   don't we?

15         MR. MANGANO:  Okay, your Honor, if --

16         THE COURT:  Don't we know how they used

17   it?

18         MR. MANGANO:  Yes and no, I can tell

19   you that.  Yes and no based upon what --

20         THE COURT:  And what don't we know

21   about how they used it?

22         MR. MANGANO:  Okay.  They're trying to

23   distinguish their use saying that their use is

24   different from the RJ's because their viewers are

25   exclusively in Oregon.

1          THE COURT:  Nobody said they were
2   exclusively in Oregon.
3          MR. MANGANO:  Okay, maybe they are not
4   in Nevada.  They haven't said that they are or
5   not.  If they do say they're in Nevada, they have
6   a problem under that first prong.
7          THE COURT:  Why?
8          MR. MANGANO:  Because we have the exact
9   same use.  We don't have this little segment that
10  they're trying to carve out that it's virtually
11  everyone in the Oregon area.  They're trying to
12  say that's unique.
13         THE COURT:  Well, their website goes to
14  immigrant -- I mean it deals with immigration
15  issues.  Let me put it that way.  So if somebody
16  is interested in immigration issues, that person
17  logs on and reads it.  That person may never
18  read -- may never have heard of the RJ until they
19  read that article and it could be somebody from
20  Illinois, it could be somebody from Nebraska.  It
21  could be somebody from Nevada, but somebody who's
22  interested in a newspaper reads the RJ.  So I
23  mean -- well, I should say -- let me rephrase
24  that.  Someone from here who's interested in a
25  newspaper typically reads the RJ.

```
 1                MR. MANGANO:  Uh-huh.
 2                THE COURT:  And so it's a totally
 3     different market.
 4                MR. MANGANO:  Well, not if you do have
 5     people from Nevada that see the article and get
 6     their information solely from that source from
 7     CIO's website, right?  They may know of the RJ
 8     and they may look at and read the article which
 9     they've read in its entirety, there's no need to
10     go --
11                THE COURT:  But the RJ has the
12     copyright, assigns it to you, so it's now yours.
13     So you aren't printing a newspaper.  Does the RJ
14     still have this on its website?
15                MR. MANGANO:  Yes.
16                THE COURT:  Are you suing the RJ?
17                MR. MANGANO:  No, your Honor.
18                THE COURT:  Why not?
19                MR. MANGANO:  Well, because we hold the
20     copyright to it.  They assigned it to us.
21                THE COURT:  Pardon me?
22                MR. MANGANO:  They assigned the
23     copyright to us.  We wouldn't sue them.
24                THE COURT:  Why not?  They have no
25     right to the material, do they?  Huh?  Huh?  Do
```

1   they?

2            MR. MANGANO:  Yes, they do.

3            THE COURT:  They do?  How do they have

4   rights to the material?

5            MR. MANGANO:  Well, I'm sure that it's

6   covered in their license agreement with the RJ

7   and the assignment.

8            THE COURT:  Okay, all right.

9            MR. MANGANO:  I mean I'm not privy to

10  that information as to how, but they do allow it

11  to be accessed from the website and they do allow

12  it to be shared via the Internet and their

13  hyperlink so they do maintain control of it.

14  They don't have the entire article being taken,

15  copied, and pasted and placed on some other

16  source, which is what happened, and when you go

17  in to read the entire article --

18            THE COURT:  Is there any question about

19  that's what happened?  We know what happened.

20            MR. MANGANO:  When you read the entire

21  article, it's someplace else, your Honor.  You're

22  not going to want to go to the source

23  publication.

24            THE COURT:  Well, you might.

25            MR. MANGANO:  You might, you might not,

1   but I'll tell you if you've got a hundred percent

2   of the article --

3           THE COURT:  Well, I mean, okay, now

4   you're -- now this has nothing to do with

5   factual.  You're just arguing, well, you might,

6   you might not.  What are the issues of material

7   fact that you say preclude us from proceeding

8   today?  Other than you've wasted so much time

9   that we'll probably have to adjourn this anyway.

10          MR. MANGANO:  Your Honor, another issue

11  is -- well, first of all, the membership

12  composition of CIO is an issue of fact because it

13  does go to the first fair use prong, the first

14  analysis it does as we've discussed that.

15          THE COURT:  How does that -- how does

16  their membership go to the first prong?  The

17  purpose and character of the use has nothing to

18  do with their membership, does it?

19          MR. MANGANO:  Okay, your Honor, then I

20  would say that --

21          THE COURT:  Well, I mean so you're

22  throwing up the old here's an argument, wait,

23  here's an argument, here's an argument.

24          MR. MANGANO:  No, your Honor.

25          THE COURT:  You haven't even thought

1  this through.  You're saying, oh, you can't grant
2  summary judgment today, you're granting summary
3  judgment.  Well, what are the issues of material
4  fact then that preclude me from proceeding today?
5  Well, let's see, half an hour later we still
6  don't know.
7         MR. MANGANO:  Okay, your Honor.  Well,
8  let's approach it this way.  Why -- my issue then
9  I see it as an issue of material fact in the
10  first fair use prong, and I would assume that
11  Professor Schultz agrees with me since he's cited
12  the factor --
13         THE COURT:  Well, leave Professor
14  Schultz out.  I don't care about him.  No
15  offense, Professor, but what are the issues of
16  material -- we're here to decide legal issues,
17  not to engage in personalities.
18         MR. MANGANO:  Okay.  The CIO -- there's
19  a statement that they say they did not profit in
20  any way because the article appeared on its blog.
21  We've conducted absolutely no discovery as to
22  whether or not CIO profited in any way, derived
23  any benefit, or received donations from its
24  members.
25         THE COURT:  Well, I'm sure they've

```
 1   received a benefit.  It's an educational benefit,
 2   that's what they say, that's what we do.  Am I
 3   correct?  Am I mischaracterizing something?
 4               MR. RICHARDSON:  No, that's correct,
 5   sir.
 6               MR. MANGANO:  Your Honor, as we've
 7   pointed out in our submissions, there's a
 8   donation banner as well as a membership banner
 9   that appears on the website.
10               THE COURT:  That's right.  And so
11   somebody sees their website and says, I like what
12   you guys are doing, I'm going to support you, I
13   mean just like any other advocacy group.
14               MR. MANGANO:  Okay, I'm following you.
15               THE COURT:  That's good.
16               MR. MANGANO:  It's the question of --
17               THE COURT:  That makes one of us
18   because I'm not following you at all.  How is
19   that relevant?
20               MR. MANGANO:  Your Honor, it's relevant
21   because under -- under --
22               THE COURT:  Okay, let's do this, let's
23   do this.  Let's just adjourn the hearing, and you
24   file genuine issues of material fact, here are
25   the issues of material fact.  And I want you guys
```

1    to respond to it and say, here's the ones we

2    agree are genuine and here's the ones that we

3    disagree.  And then I'll decide what's -- I'll

4    give you time to do discovery so that you can

5    respond properly to this.  How is that?  How is

6    that?  Can you answer one question?  Can you hear

7    me?

8              MR. MANGANO:  Yes, your Honor.

9              THE COURT:  And what's your answer?

10   Does that meet with your approval?

11             MR. MANGANO:  Yes.  Your Honor, if

12   that's --

13             THE COURT:  Fine, sit down.

14             MR. MANGANO:  Okay.

15             THE COURT:  How long will it take you

16   to generate a list of the genuine issue of

17   material facts?

18             MR. MANGANO:  Five days, your Honor.

19             THE COURT:  Pardon me?

20             MR. MANGANO:  Five days?

21             THE COURT:  Well, the holiday is coming

22   up.

23             MR. MANGANO:  So ten, would that be

24   acceptable?

25             THE COURT:  So let's make it -- what

```
1   would be next Friday?
2           THE CLERK:  Friday, January 7th, your
3   Honor.
4           THE COURT:  Friday, January 7th.  By
5   Friday, January 7th, file and serve these are the
6   genuine issues of material fact that we feel
7   preclude the court proceeding on the fair use
8   hearing, do you understand?
9           MR. MANGANO:  Yes, your Honor, we can
10  do that.
11          THE COURT:  Thank you.  And then a week
12  for you to respond the following Friday, is that
13  agreeable?
14          MR. RICHARDSON:  That's plenty of time.
15          THE COURT:  And, Professor, you as well
16  as the amicus, if you want to respond and say
17  since you apparently seem to be the focus of
18  something here, I don't know what --
19          MR. SCHULTZ:  Thank you, your Honor.
20                  Yes, I'd appreciate that
21  opportunity.
22          THE COURT:  Yes, sir.
23                  So then I'll review that with my
24  brain trust and we'll see whether we agree with
25  your statements of issues and what they are and
```

1    how much discovery is worthwhile here.

2                        We'll be in recess.

3

4         (Whereupon, the proceedings concluded.)

5

6

7

8

9

10

11

12

13                        I hereby certify that pursuant

14   to Section 753, Title 28, United States Code, the
     foregoing is a true and correct transcript of the

15   stenographically reported proceedings held in the
     above-entitled matter.

16

17

     Date:  January 3, 2011          /s/ Joy Garner

18                                    JOY GARNER, CCR 275
                                      U.S. Court Reporter

19

20

21

22

23

24

25

                        ——JOY GARNER, CCR 275——
                   LAS VEGAS, NEVADA  (702)384-3188